Christopher Karr
Karr Law Firm, PLLC
517 E. Spruce Street
Missoula, Montana  59802
608-213-4921
karrlawfirm@gmail.com

*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, <br><br> Plaintiff, <br><br> vs. <br><br> KEN SALAZAR, Secretary of the Interior; ROWAN GOULD, Acting U.S. Fish and Wildlife Service Director; and UNITED STATES FISH AND WILDLIFE SERVICE, <br><br> Defendants. | **CASE NO.** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. In this case, plaintiff Center for Biological Diversity challenges the constitutionality of Section 1713 of the Department of Defense and Full-Year Continuing Appropriations Act of 2011, P.L. 112-10 ("Section 1713" or the "Rider"), as applied by the U.S. Department of the Interior and the U.S. Fish and

1

Wildlife Service ("FWS") in their May 5, 2011 reissuance of the April 2, 2009 final rule delisting the gray wolf ("Delisting Rule") under the Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA" or "Act").  See 74 Fed. Reg. 15,123 (Apr. 2, 2009); 76 Fed. Reg. 25,590 (May 5, 2011).

    2.    Section 1713, enacted as a rider to the government's appropriations bill, is a response to this Court's August 2010 declaration that the Delisting Rule's removal of ESA protections for the gray wolf in the northern Rocky Mountains violated the ESA.  Defenders of Wildlife et al. v. Salazar et al., 729 F.Supp.2d 1207 (D. Mont. 2010) ("DOW v. Salazar"); see 75 Fed. Reg. 65,574 (Oct. 26, 2010) (reinstating ESA protections for the gray wolf in the northern Rockies). This Court's Order is currently pending on appeal before the Ninth Circuit Court of Appeals.  Without amending the ESA, Section 1713 directs FWS to reissue the Delisting Rule and purports to remove the courts' ability to adjudicate the lawfulness of the Delisting Rule.  It is the only time, in the ESA's nearly 40-year history, that Congress has legislatively delisted a species.

    3.    Even as it directs a legislative outcome to a matter pending before the federal courts, Section 1713 provided no new circumstances or substantive law, and did not amend the ESA.  As such, Section 1713 is in violation of the separation of powers that must be maintained between the legislative and judicial branches

under the U.S. Constitution.  Accordingly, the reissued Delisting Rule is unlawful and must be set aside.

## JURISDICTION

4.      Judicial review of agency action is provided by the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA").  This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 (federal question), 1346 (United States as a defendant), and § 1361 (Action to compel an officer of the United States to perform his duty).

5.       The Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.

## VENUE

6.      Venue is proper in this District under 28 U.S.C. § 1391 because one or more of Plaintiff's members reside in the District of Montana; land affected by the challenged action is within the District of Montana; and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Venue is proper in the Missoula Division because every county within the Missoula Division is also within the northern Rocky Mountain gray wolf's range that is affected by the challenged action.

## PARTIES

7. Plaintiff Center for Biological Diversity is a nonprofit organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center was founded in 1989, and is based in Tucson, Arizona with offices in California, Minnesota, New Mexico, Oregon, Washington, and Washington, D.C. The Center has more than 42,000 members, including many who reside in, explore, and enjoy the northern Rockies and the gray wolf.

8. The Center has advocated for gray wolf recovery since the 1990s. The Center and its members wish to see healthy gray wolf populations in all suitable habitat throughout the species' historic range in the conterminous U.S. including the northern Rockies. To realize that vision, the Center has participated in countless rulemakings for wolf management and has halted multiple unlawful downlisting and delisting attempts by FWS through litigation. The Center also runs conservation programs in all regions of the United States, including in regions where efforts are needed to conserve the species and its habitats.

9. Members of the Center hike, camp, backpack, ski, and view and photograph wildlife and plants in the northern Rockies. Members of the Center seek to view wolves and signs of wolf presence in the wild. The reissued Delisting Rule will reduce their opportunity to do so. The legal violations alleged in this complaint cause direct injury to the aesthetic, conservation, recreational, scientific,

educational, and wildlife preservation interests of the Center and its members. Elimination of ESA protections for gray wolves in the northern Rockies will also cause irreparable harm to Plaintiff's recreational and aesthetic interests.

10. Defendant Ken Salazar is the United States Secretary of the Interior. In that capacity, Secretary Salazar has supervisory responsibility over the U.S. Fish and Wildlife Service. Defendant Salazar is sued in his official capacity.

11. Defendant Rowan Gould is the Acting Director of the U.S. Fish and Wildlife Service. Defendant Gould is sued in his official capacity.

12. Defendant United States Fish and Wildlife Service is a federal agency within the Department of Interior. FWS is responsible for administering the ESA with respect to terrestrial wildlife such as gray wolves.

## LEGAL BACKGROUND

### A. THE SEPARATION OF POWERS IN THE U.S. CONSTITUTION

13. Article III of the U.S. Constitution establishes that the judicial power of the United States, encompassing cases and controversies, lies in the federal courts and not in Congress. The separation between the judiciary and legislative branches is part of the constitutional principle known as "separation of powers."

14. Congress, which is established under Article I of the U.S. Constitution, violates the separation of powers where it impermissibly directs certain findings in pending litigation without changing the underlying law. U.S. v.

Klein, 80 U.S. (13 Wall.) 128 (1871); Robertson v. Seattle Audubon Soc'y, 503 U.S. 429 (1992).

**B.     THE ENDANGERED SPECIES ACT**

15.     The Endangered Species Act was enacted, in part, to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Section 2(c) of the Endangered Species Act establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." 16 U.S.C. § 1531(c)(1). The Act defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3).

16.     The ESA provides substantive protections to "species" listed as "endangered" or "threatened" by FWS.

17.     The ESA defines a "species" to mean "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." Id. § 1532(16). A "distinct population segment" is the smallest-possible

6

taxonomic distinction provided by the ESA and allows FWS to provide differing levels of protection to different populations of a species.

19. The ESA defines as "endangered" a species that is "in danger of extinction throughout all or a significant portion of its range." Id. § 1532(6).

19. The ESA defines as "threatened" a species "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. § 1532(20).

20. When listing or delisting a species, the ESA requires FWS to consider five categories of threats to a species. These criteria are:

>    (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
>    (B) overutilization for commercial, recreational, scientific, or educational purposes;
>    (C) disease or predation;
>    (D) the inadequacy of existing regulatory mechanisms; [and]
>    (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c). If any one of these factors causes the species to be in danger of extinction or likely to become an endangered species in the foreseeable future throughout all or a significant portion of its range, the species must be listed, and cannot be delisted until none of these factors are present.

21. Listing decisions must be made "solely on the basis of the best scientific and commercial data available," and without reference to possible

7

economic or other impacts of such a determination.  16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(b); 50 C.F.R. § 424.13.

22. "A species may be delisted only if [the best scientific and commercial data available] substantiate that it is neither endangered nor threatened," because it is extinct, recovered, or the original data for classification was in error.  50 C.F.R. § 424.11.

23. A species reaches "recovery" when there is "improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in [16 U.S.C. § 1533(a)(1)]."  50 C.F.R. § 402.02.

24. The ESA provides a specific process for delisting a species, including opportunities for public notice and comment and a review by FWS of the status of the species.  50 C.F.R. Part 424.

## FACTUAL BACKGROUND

### A. REMOVAL OF ESA PROTECTIONS FOR THE GRAY WOLF UNDER THE ENDANGERED SPECIES ACT

25. The gray wolf (*Canis lupus*) historically inhabited most of North America, except for portions of the driest deserts and today's southeastern United States.  Some studies have estimated that historically, there may have been as many as two million wolves in the western U.S. and Mexico, including more than 350,000 gray wolves in the American West.  But today, wolves occupy only about five percent of their historic range in the U.S., in three areas – the northern Rocky

Mountains, Great Lakes region, and southwestern U.S. – with a combined total population of approximately 5,000 to 6,000 wolves.

26.  This severe reduction in wolf numbers was caused by widespread habitat destruction as well as federal policies, implemented over the course of many decades, to exterminate wolves from the landscape.  With the European settlement of North America, "superstition and fears … led to widespread persecution of wolves."  68 Fed. Reg. 15,804, 15,805 (Apr. 1, 2004).  According to FWS, "wolves were hunted and killed with more passion and zeal than any other animal in U.S. history."  U.S. Fish and Wildlife Service, Gray Wolf, http://training.fws.gov/library/Pubs/graywolf.pdf (last checked May 4, 2011).  This hunting, together with an active eradication program sponsored and carried out by FWS and its predecessor agency, resulted in the extirpation of wolves from more than 95 percent of their range in the lower 48 states.  See 68 Fed. Reg. at 15,805; 72 Fed. Reg. 6,106, 6,125 (Feb. 8, 2007).  In Montana, Idaho, Wyoming, and adjacent southwestern Canada, wolves were exterminated by the 1930s.  See 74 Fed. Reg. at 15,123.

27.  Although the federal government no longer explicitly pursued such policies when Congress enacted the ESA in 1973, wolf populations remained small and isolated and continued to be threatened by genetic inbreeding and poaching, as well as by ongoing federal and state predator control policies.

9

28. In 1974, FWS listed four subspecies of gray wolf as endangered, including: the northern Rocky Mountain gray wolf (*Canis lupus irremotus*); the eastern timber wolf (*C. l. lycaon*) in the northern Great Lakes region; the Mexican wolf (*C. l. baileyi*) in Mexico and the southwestern United States; and the Texas gray wolf (*C. l. monstrabilis*) of Texas and Mexico. 39 Fed. Reg. 1171 (Jan. 4, 1974). In 1978, FWS relisted the gray wolf as endangered at the species level (*C. lupus*) throughout the conterminous 48 States and Mexico, except for Minnesota, where the gray wolf was reclassified as "threatened." 43 Fed. Reg. 9607 (Mar. 9, 1978).

29. FWS established a recovery goal for gray wolves in the northern Rockies, in its 1987 northern Rocky Mountain gray wolf recovery plan, of 10 breeding pairs living in each of three separate areas for at least three consecutive years.

30. In 1994, FWS designated unoccupied portions of Idaho, Montana, and Wyoming as two nonessential experimental population areas for the gray wolf under section 10(j) of the Act. 15 U.S.C. § 1540(j); 59 Fed. Reg. 60,252 (Nov. 22, 1994); 59 Fed. Reg. 60,266 (Nov. 22, 1994). One of these populations, the Yellowstone Experimental Population Area, consists of all of Wyoming and portions of eastern Idaho, southeastern Montana. The second of these populations was designated in central Idaho. FWS reintroduced 66 gray wolves from Canada

into these two areas in 1995, thereby implementing its plan to recover wolves in the northern Rockies. 59 Fed. Reg. 60,252; 72 Fed. Reg. 36,942, 36,943 (July 6, 2007).

31. When FWS reintroduced the gray wolf into the northern Rockies, it prepared an environmental impact statement in which it reaffirmed the 1987 recovery goals. At that time, FWS determined that northern Rockies wolves must also form a metapopulation, with genetic exchange between subpopulations and acknowledged that then-current scientific literature showed that long-term viability for wolf populations would require an effective population size ($N_e$) of at least 500 wolves.

32. Since returning to their native landscape, wolves have reproduced and established packs, and have restored a more natural balance to northern Rockies ecosystems. Wolves benefit the health of elk and deer populations by virtue of their selection of prey animals, as they primarily take the old, the very young, the injured, and the diseased, leaving the healthiest animals to produce the next generation. In Yellowstone National Park, the renewed presence of wolves has altered the behavior of elk, which now tend to avoid browsing in areas where they are most vulnerable to predation, and in turn have reduced destruction of young aspen and willow shoots. The restoration of shrubs and trees in riparian areas controls stream erosion, and supports native bird communities, beavers, and

other wildlife. Wolves aggressively prey on coyotes within wolves' home territories. By reducing the number of coyotes in the area, the presence of wolves has also benefited populations of small rodents, birds of prey (who feed on the rodents), and pronghorn antelopes (who are often preyed upon by coyotes).

33.  There are now three sub-populations of gray wolves in the northern Rockies. At the end of 2008, FWS estimated that in total, the northern Rockies wolf population numbered approximately 1,650. See 74 Fed. Reg. at 15,137.

34.  The northern Rocky Mountains population, even were it not fragmented into three subpopulations, is well below levels that scientists consider to be viable. A 2007 study estimated a median minimum viable population ("MVP") size of 4,169 individual wolves, while another study estimated a mean MVP of 7,316 wolves. Even in the contracted area where it now occurs in the northern Rockies, the wolf population there continues to be threatened by a relatively small population size.

35.  FWS's western gray wolf recovery coordinator, Ed Bangs, has said about FWS's updated recovery goal, "I, personally, think it is too low." Virginia Morell, Wolves at the Door of a More Dangerous World, Science, at 891 (Feb. 15, 2008).

36.  Based on its recovery goal, FWS has attempted to reduce or remove ESA protections for distinct population segments of the gray wolf in the northern

Rockies. 68 Fed. Reg. 15,804 (Apr. 1, 2003); 73 Fed. Reg. at 10,517. These attempts have been set aside by Article III courts. <u>Defenders of Wildlife v. Sec'y, U.S. Dep't of Interior</u>, 354 F.Supp.2d 1156 (D. Or. 2005); <u>Defenders of Wildlife v. Hall</u>, 565 F.Supp.2d 1160 (D. Mont. 2008).

37. Most recently, this Court determined that the Delisting Rule was unlawful under the ESA, because the ESA does not allow FWS to list only part of a "species" as endangered, or to protect a listed distinct population segment only in part, and because the ESA's legislative history does not support FWS's interpretation of the phrase "significant portion of its range" but rather, supports the historical view that FWS has always held, *i.e.*, that the ESA does not allow a distinct population segment to be subdivided. <u>DOW v. Salazar</u>, 729 F.Supp.2d at 1211.

38. After <u>DOW v. Salazar</u> was decided, on October 1, 2010, multiple appeals were taken to the Ninth Circuit Court of Appeals. <u>DOW et al. v. State of Idaho et al.</u>, Civ. No. 10-35885; <u>DOW, et al. v. Montana Farm Bureau Fed'n et al.</u>, Civ. No. 10-35886; <u>DOW, et al. v. Ken Salazar, et al.</u>, Civ. No. 10-35894; <u>DOW, et al. v. Safari Club International, et al.</u>, Civ. No. 10-35897; <u>DOW, et al. v. State of Montana, et al.</u>, Civ. No. 10-35898; <u>DOW, et al. v. Salazar, et al.</u>, Civ. No. 10-35926. Those appeals have been consolidated and are still pending.

39. On November 16, 2010, the U.S. District Court for the District of Wyoming issued an order in consolidated cases setting aside FWS's determination that Wyoming's management plan for the gray wolf was inadequate, and remanded the determination to FWS. FWS initially appealed this decision, but has dismissed its appeal.

**B.    THE RIDER**

40. After <u>DOW v. Salazar</u> was decided, members of Congress began to undertake various legislative efforts to delist the gray wolf in the northern Rockies and other areas in the lower 48 states. These efforts resulted in the passage of the Rider, Section 1713.

41. Senator John Tester of Montana attached Section 1713 to the Department of Defense and Full-Year Continuing Appropriations Act of 2011, P.L. 112-10, which was passed by Congress on April 15, 2011. Section 1713 states as follows:

> SEC. 1713. Before the end of the 60-day period beginning on the date of enactment of this Act [i.e., before June 14, 2011], the Secretary of the Interior shall reissue the final rule published on April 2, 2009 (74 Fed. Reg. 15123 et seq.) without regard to any other provision of statute or regulation that applies to issuance of such rule.  Such reissuance (including this section) shall not be subject to judicial review and shall not abrogate or otherwise have any effect on the order and judgment issued by the United States District Court for the District of Wyoming in Case Numbers 09–CV–118J and 09–CV–138J on November 18, 2010.

42. In response to Section 1713, FWS reissued the unlawful Delisting Rule on May 5, 2011. 76 Fed. Reg. 25,590.

## CAUSE OF ACTION
### (Violation of the Separation of Powers of the U.S. Constitution)

43. Plaintiff hereby realleges and incorporates the preceding paragraphs.

44. Section 1713 was designed to and directed an outcome in the pending appeals before the Ninth Circuit Court of Appeals in DOW v. Salazar. Section 1713 does not amend the ESA or otherwise provide new substantive law to apply. Section 1713 therefore unconstitutionally infringes on the powers of the judicial branch in violation of the separation of powers because it impermissibly directs a result to pending litigation without changing underlying law. U.S. v. Klein, 80 U.S. (13 Wall.) 128 (1871); Robertson v. Seattle Audubon Soc'y, 503 U.S. 429 (1992).

45. Section 1713 provides that the Rider itself is not subject to judicial review. However, this provision is also a violation of the separation of powers because the U.S. Constitution provides that acts of Congress are reviewable by Article III courts for constitutional questions.

46. Because the FWS's reissuance of the Delisting Rule is not in accordance with and contrary to the separation of powers in the U.S. Constitution, it also violates the APA. 5 U.S.C. §§ 706(2)(A), 706(2)(B).

## PRAYER FOR RELIEF

THEREFORE, Plaintiff respectfully requests that this Court:

1. Declare that Section 1713 violates the separation of powers in the U.S. Constitution;

3. Set aside FWS's reissued Delisting Rule, as it is based on Section 1713 which is unconstitutional, and issue an injunction reinstating ESA protections for gray wolves in the northern Rockies;

3. Award Plaintiff its reasonable fees, costs, and expenses, including attorneys fees, associated with this litigation; and

4. Grant Plaintiff such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 5th day of May, 2011.

/s/ *Christopher Karr*
Christopher Karr
Karr Law Firm, PLLC
517 E. Spruce Street
Missoula, Montana 59802
608-213-4921
karrlawfirm@gmail.com

*Attorney for Plaintiff*